MEMORANDUM OF DECISION
This memorandum of decision addresses a petition for termination of the parental rights (TPR) of Alvin S., Sr. (Alvin Sr.) and Rose A., the married, biological parents of the minor children, Debra S. and Alvin S. Debra was born on April 1993, and Alvin was born on November 1994. The TPR petition was originally filed by DCF on January 5, 1999, and was thereafter amended.[2] The amended petition alleges that both respondent parents have failed to rehabilitate themselves, within the meaning of § 17a-112(c)(3)(B)(1), and that they have abandoned their children, within the meaning of § 17a-112(c)(3)(A). For the reasons stated below, the court finds this matter in favor of the petitioner.
On October 29, 1998, following a court hearing, Debra and Alvin were adjudicated neglected children and were committed to DCF for a period of twelve months, (Keller, J.). Thereafter, on September 7, 1999, the commitment was extended for an additional twelve months and the court found that reunification efforts were no longer appropriate for either respondent parent. (Keller, J.; Exhibit 14.) On August 29, 2000, the commitment was extended through August 29, 2001 (Brenneman, J.).
The termination of parental rights trial commenced on October 16 and continued through October 18, 2000. The respondent parents were present and represented by counsel at each court session. The petitioner and the minor children were represented by their respective attorneys throughout the trial. Counsel for the minor children, also serving as GAL, presented closing argument to the court, as did counsel for the parties to this action.
The parties introduced multiple documentary exhibits into evidence CT Page 1779 during the trial, including psychological reports, laboratory analyses and the social study. Testimony was elicited from multiple witnesses including a psychologist, maternal health-care worker, probation officer, foster parent, substance abuse counselors and social workers.
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of these children.
 I. FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study, psychological examination, and testimony presented, according to the standards required by law.[3]
Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
Alvin Sr. has fathered five children in addition to Debra and Alvin.[4]
He has not provided financial or emotional support for any of these other children.
A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF NOVEMBER 29, 1998
Rose A. and Alvin Sr. have been known to DCF since 1995, when the department commenced the first of four investigations concerning allegations that they had neglected their children Debra and Alvin. (Exhibit 14.) Thereafter, in March of 1998, the family was referred again by a local clinic in connection with Rose A.'s use of cocaine during her pregnancy, and the indicia of domestic violence upon her physical presentation. (Exhibit 15.)
Shyheim S., a medically fragile child with multiple disabilities, was born to the respondent parents on April 1998. Due to the infant's specialized medical needs, he was placed into a foster home directly from the hospital where he was born. (Exhibit 3-3.) On June 4, 1998, DCF prepared a care plan which presented a number of specific steps for Rose A. and Alvin Sr. to follow before they could regain custody of Shyheim. (Testimony of Eric B.; Exhibit 3-3.)
Debra and Alvin were removed from the care of Rose A. and Alvin Sr. on October 21, 1998, following the respondent parents' failure to comply with expectations which had been specifically directed at Shyheim, but which had also been extended to cover Debra and Alvin. (Exhibit 14.) On that date, the court provided specific steps for the respondent mother to follow to facilitate the return of Debra and Alvin to her custody, largely mimicking those steps which had been issued as to Shyheim S. CT Page 1780 (Dyer, J.) (Exhibits 3, 4.) These steps included the specific order for Rose A. to ". . . enroll in a Women and Children Residential program which will provide individual counseling and substance abuse treatment for [Rose A.]. According to [Rose A.'s] progress in treatment, DCF may consider reunifying the children in the program." (Exhibit 4.) The steps further required Rose A. to participate in parenting and individual counseling to learn "appropriate parenting skills in order to successfully provide for her children" and to address her "past history of sexual abuse and violence against [her]."[5] (Exhibit 4.) Specific steps were ordered on that date for Alvin Sr., as well.[6]
Rose A. was born on March 18, 1977. She attended school through grade ten. (Exhibit 6.) She had a history of physical and sexual abuse by her father, brother, ex-boyfriend and his friend, followed by a six month period of therapy at Hartford Hospital to deal with the aftermath of this abuse. (Exhibit 6.) Prior to her involvement with DCF, Rose A. also had received outpatient substance abuse treatment through St. Francis Hospital. In 1998, Rose A. had spent five weeks at Blue Ridge, where she received outpatient drug treatment until she was discharged due to a conflict with a counselor and noncompliance with program conditions. (Exhibit 6, 14.)
On October 2, 1998, upon DCF's referral, Rose A. underwent a substance abuse/dependency evaluation at Hartford Behavioral Health, in conjunction with the Wheeler Clinic. (Exhibit 10, 14.) Rose A. reported chronic use of cocaine and marijuana during recent years, and was diagnosed with dependence on both drugs.[7] Wheeler Clinic recommended that she attend the LifeLine Program for substance abuse treatment five days per week. (Exhibit 6.) However, as Rose A. failed to make reasonable efforts to attend or to comply with this recommendation, the agency discontinued its proffer of help. (Exhibit 10, 14.)
Rose A. had difficulty maintaining adequate housing. She entered the Salvation Army Shelter on October 6, 1998 but was discharged two days later for failure to comply with the curfew. She thereafter resided at the Friendship Center Shelter through October 14, 1998. She moved to My Sister's Place on October 15, 1998, but was discharged the same day for drug use and curfew violation. (Exhibit 14.)
On August 13, 1996, Rose A. had been convicted of Burglary in the third degree (§ 53a-103) and Failure to Appear in the first degree (§53a-172). She was sentenced to four years of incarceration, suspended after six months, with three years of probation.[8] (Exhibit 1.)
Alvin Sr. was born on February 10, 1967 and attended school through age fourteen. (Exhibit 7.) He has a history of convictions related to drugs CT Page 1781 and violence dating back to 1988.[9] On November 9, 1992, Alvin Sr. was convicted of Interfering with a police officer (§ 53a-167), and was sentenced to one year, suspended, with one year of probation. On March 3, 1994, he was convicted of Sexual Assault in the third degree (§53a-72a), and was sentenced to five years, suspended, with three years of probation. On that same date, he was also convicted of Attempted Risk of Injury to a Minor (§ 53-21), and received a concurrent sentence of six years of incarceration, suspended after three years, with three years of probation. On April 15, 1994, he also received like sentence for Sale of a Controlled Substance (§ 21a-277 (b)). (Exhibit 2.)
Alvin Sr. had been scheduled to attend a substance abuse evaluation at Blue Ridge during the spring of 1998. However, he failed to attend that appointment, and missed three rescheduled appointments for such evaluation. (Exhibit 14.) Thereafter, on July 20, 1998, Alvin Sr. completed a substance abuse evaluation, although he failed to comply with follow-up assessments as recommended. (Id.)
B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF NOVEMBER 29, 1998
Between the date of the neglect finding and the filing of the TPR petition, Rose A. failed to maintain adequate housing, and had no legal income except for a short stint working in a department store, notwithstanding the continuance of the court-ordered specific steps. Neither parent complied with the conditions for once weekly contact with the children's foster mother Sara G. or visitation with the children. (Testimony of Lisa W-C.)
On December 29, 1998, Rose A. was arrested and charged with Prostitution. Held in lieu of bond, on January 28, 1999 she was convicted of violating § 53a-82 and was sentenced to serve six months of incarceration. (Exhibit 1.) Upon her discharge, she participated for a time in a Salvation Army program directed at victims of domestic violence and addressing substance abuse issues. However, she was discharged for non-compliance after a few weeks, and thus lost the opportunity to receive the parenting and individual counseling services which were also offered. (Exhibit 14.) On multiple occasions during conversations with the family's DCF worker, Rose A. related incidents of abuse by Alvin Sr., including nonconsensual sexual relations. (Testimony of Lisa W-C.)
Later in 1999, the family's DCF worker drove Rose A. to Hogar Crea, where she registered for that agency's long-term residential rehabilitation program, which would both provide the substance abuse treatment she needed, and ensure her physical safety by separating her from Alvin Sr. At that time, Rose A. admitted that she was continuing to use cocaine on a regular basis, as was Alvin Sr., and that they were CT Page 1782 spending over $150 per week to purchase drugs. Rose A. again stated that Alvin Sr. continued to demonstrate periodic bouts of violence, during which periods he would abuse her or forcibly remove her clothing and search her for drugs or money that could be used to purchase drugs. The family's DCF worker also drove Rose A. to register for the Connection, Inc. residential program for women and children, where drug treatment and domestic violence counseling would also have been made available to her. (Testimony of Eric B., Exhibit 14.) Despite her applications and DCF's facilitation, Rose A. did not enter either Hogar Crea or the Connections program between February 1998 and March 1999, nor did she accept domestic violence counseling which DCF offered through Interval House or the two other separate shelters which DCF recommended for the provision of housing and temporary support. (Testimony of Eric B.; Exhibit 3-3.)
In mid-October 1999, while Alvin Sr. was in treatment as described below, the family's social worker entreated Rose A. to enter a shelter at the Wheeler Clinic. She refused to accept this recommendation. (Testimony of Lisa W-C.) However, on November 19, 1999, Rose A. entered a drug detoxification program at Mt. Sinai Hospital. (Testimony of Stephanie C.) Rose A. received in-patient treatment from that facility, cooperated and refrained from using drugs until her successful discharge in February 2000. After her release, she was sent to reside at a YMCA shelter.[10]
(Testimony of Lisa W-C.) Rose A. next received relapse-prevention treatment from the Alcohol and Drug Rehabilitation Center (ADRC), and was successfully discharged from this program on March 14, 2000. (Testimony of Lisa W-C., Stephanie C.; Exhibit K.)
Alvin Sr. received no treatment for drug abuse or domestic violence problems between February 1998 and March 1999, although, at DCF's referral, he had received a substance abuse evaluation at Hartford Behavioral Health Services (HBH). He was also referred for a domestic violence evaluation, but he did not cooperate with that assessment. (Testimony of Eric B.) Near the end of May 1999, the family's DCF worker referred Alvin Sr. to the parenting program sponsored by Hartford Interval House. As he was unable to provide the co-pay for this program, he was referred to the parenting education classes sponsored by Catholic Family Services. He attended an intake session at that agency, but was subsequently disqualified from the program due to his non-attendance at three classes. (Testimony of Lisa W-C.; Exhibit 13.)
DCF continued to make referrals for Alvin Sr. to obtain drug treatment. On May 3 and June 3, 1999, he was directed to participate in a program at HBH, but he failed to appear. Although the family's social worker again called HBH, they would no longer accept Alvin Sr. as a client because of his non-compliance. An appointment was made for him to receive similar treatment at the Wheeler Clinic commencing in June 1999 CT Page 1783 but Alvin Sr. again failed to appear. (Testimony of Lisa W-C.)
Alvin Sr.'s capacity for anger and his lack of cooperation with DCF were demonstrated at an unannounced home visit on June 24, 1999. Although Alvin Sr. was present in the home, he stated to the family's DCF worker that he didn't want to talk to her or to be bothered that day. When the worker raised the issues of infrequent visitation and reports of drug use, he exploded with anger, ranting, raving and blaming the worker for DCF's continued custody of his children, and ascribing all of his problems to Rose A.'s failure to cooperate. (Testimony of Lisa W-C.) Alvin Sr. has admitted to weekly episodes of arguments and violence between himself and Rose A., and that his anger and violence extends to others as well. (Exhibit 7.)
Thereafter, in July of 1999, Alvin Sr. asked the family's social worker to assist him in addressing his substance abuse issues. On July 23, 1999, at DCF's referral, he underwent a substance abuse evaluation at Wheeler Clinic. He reported a history of using various forms of cocaine and alcohol for the majority of his adult years. At the time of the evaluation, he reported using crack cocaine approximately 3-4 times a week. He denied current marijuana use. (Exhibit 7.)
Alvin Sr. was diagnosed with cocaine and alcohol dependency, and a condition referred to as "Intermittent Explosive Disorder." Wheeler Clinic recommended that he immediately commence a five-day period of detoxification, followed by six weeks of outpatient substance abuse treatment and ten weeks of anger management therapy. (Exhibit 7.) He underwent detoxification at Reid Treatment Center (Reid), along with additional treatment. Upon his successful discharge from Reid, Alvin Sr. stayed at Farrell House and then at the Open Hearth Shelter. He began attending classes at the Alternative Learning Center, and received after-care at the ADRC, successfully completing that program on January 12, 2000. (Testimony of Lisa W-C.; Father's Exhibit AA.) Upon Alvin Sr.'s discharge from the ADRC, periodic urinalysis was to be in effect to help measure the success of this rehabilitation program.[11] (Testimony of Lisa W-C.)
Between the adjudication of neglect and the filing of the TPR petition in early January of 2000, Alvin Sr. continued to encounter difficulty maintaining adequate housing and legal income as required by the specific steps. He worked a few stints at temporary, short-term jobs, although he failed to advise DCF of this employment, and failed to report any income. He moved his residence on several occasions: to East Hartford; to Mercy Housing shelter; to Worcester; and back to his residence with his sister, without notifying DCF of these moves, notwithstanding the requirements to do so imposed through the specific steps. (Testimony of CT Page 1784 Lisa W-C.)
C. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON JANUARY 13, 2000
In early 2000, DCF referred Rose A. to the Hartford Health Department's Material Infant Outreach Program (MIOP) for management of her current pregnancy. During Rose A.'s receipt of services from that agency's health care workers, her persistent drug use was noted, as was her continued physical abuse by Alvin Sr. (Exhibit 11, I.)
On February 8, 2000, Rose A. was convicted of violation of probation (§ 53a-32), and was sentenced to a period of probation that would run through February 11, 2002.[12] (Exhibit 1.) In late February of 2000, just days after the interactional evaluations performed at the order of the court, and close upon her probation adjudication, Rose A. was discharged from the YWCA where she was residing, due to her violation of their rules prohibiting smoking crack on the premises, her curfew violations, and her failure to make appropriate plans for housing herself.[13] (Testimony of Lisa W-C.; Exhibit 12.)
On February 14 and 16, 2000, court-ordered interactional evaluations of Rose A., Alvin Sr., and their children Shyheim, Alvin and Debra were performed by Dr. Bruce Freedman, a licensed clinical psychologist. Dr. Freedman has much skill and experience in forensic evaluations related to children and their families, as well as in the diagnosis, treatment and behavior patterns of substance abusers. By means of the interactional evaluations and review of the histories pertaining to Rose A. and Alvin Sr., Dr. Freedman was able to observe and assess the respondent's parenting skills and their general relationship with the children who participated in the sessions.[14] In each aspect, the court found Dr. Freedman's testimony to be logical, detailed, consistent, articulate and explicative of the evidence related to the family at issue in this TPR proceeding.[15]
Dr. Freedman noted a number of serious problems related to Rose A.'s mental and emotional functions. She has an IQ of 66, indicating mild mental retardation, ranging at the lowest percentile of measured IQ's for adults. She presented with a high level of anger related to her lack of trust, and a high level of mental confusion and difficulty in keeping her thoughts in order. Rose A. demonstrated difficulty managing her son Alvin's sometimes-negative behavior. She was unable to create a positive or friendly atmosphere when interacting with this child, and resorted to ineffective means such as unwarranted criticism and threats or name calling when attempting to discipline him. She had a far better interaction with the more placid and accepting Debra, who placed fewer demands upon her mother. (Testimony of Dr. Freedman.) CT Page 1785
During the interactional evaluation, Alvin Sr. interacted appropriately with the children, conversing with them, fashioning simple activities, and entertaining them well during the one hour visitation. (Testimony of Dr. Freedman.) As of August 14, 2000, Alvin Sr. had been successfully participating in the Community Renewal Team's (CRT) Project T.E.A.C.H. program. (Exhibit FF.) Alvin Sr. currently resides with his mother in the same city where the children live and where Rose A.'s program is located.
On March 6, 2000, the family's DCF worker made an unannounced visit to the home of the respondent parents to discuss their non-compliance with the drug screen process required by the specific steps. Both parents were present. The odor of burning cocaine was present in the house, and Alvin Sr. refused to enter the room in which the worker was located. He shouted expletives, indicated his intention to avoid examination by the worker, and directed that she be told to leave the premises. (Testimony of Lisa W-C.)
In March of 2000, Rose A.'s probation conditions included submission to medical, psychological and substance abuse examinations and treatment, and no violation of the law. On March 16, 2000, a urinalysis of Rose A. established that she had recently ingested cocaine and marijuana, in violation of her probation and in violation of the specific steps then in place. Thereafter, in further violation of her probation, Rose A. left this state without the permission of her probation officer. Upon her return to Connecticut, Rose A. was advised that she had the option of either becoming subject to a warrant for violation of her probation, facing imminent reincarceration, or enrolling in Fresh Start, a long-term in-patient drug treatment program. (Testimony of Karen H., Karen V.; Exhibit A.)
On April 3, 2000, Alvin Sr. was convicted of Breach of Peace (§53a-181) for an offense that had occurred on April 1, 2000, and received an unconditional discharge. The charges arose from a verbal argument between the respondent parents. (Testimony of Lisa W-C.; Exhibit 2.)
Rose A. elected to avoid incarceration by entering Fresh Start, which program she commenced on May 5, 2000. She will be a resident of the Fresh Start facility through at least May 5, 2001, living separately from her husband, and from Debra and Alvin until that date.[16] (Testimony of Karen H.) In addition to addressing her substance abuse problems, the Fresh Start program also provides services which will deal with Rose A.'s domestic violence and post-sexual assault history, develop parenting skills, assist with anger management and provide opportunity for completion of her G.E.D. (Testimony of Lisa W-C., Karen V.; Exhibit A.) CT Page 1786 While at Fresh Start, Rose A. also attends drug after care classes at the Institute of Living (Exhibit F.), anger management classes facilitated through the Families in Crisis, Inc. program (Exhibit C.), academic instruction (Exhibit B.), and receives support services for battered women and their children through Hartford Interval House, Inc. (Exhibit D.) Rose A. has received a certificate of completion for her participation in Fresh Start's Anger Management/Self Esteem Group. (Exhibit J.) Raheim S., who was born August 10, 2000, is permitted to reside with Rose A. at the Fresh Start residence because his mother there receives counseling, food, treatment, support services on a twenty-four hour a day basis, adequate sleeping and housing, and the other complements necessary to ensuring this child a safe and secure residence. (Testimony of Lisa W-C., Karen V.; Exhibit A.) She has been advised that if she fails to meet program conditions, her probation will be violated. (Testimony of Karen H.)
D. CHILDREN WHO ARE SUBJECT TO THE TPR PETITION
For approximately two years, since October of 1998, Alvin and Debra have resided in the home of Sara G., a licensed foster parent. A former neighbor who has known the respondent parents for some years, the children also knew Sara G. well prior to the time when they went to live with her. They have always called her "Auntie Sara." Sara G.'s home is located ten to fifteen minutes' walking distance from the building in which the respondent parents resided during the past few years: this distance can be covered in five minutes by automobile. Sara G. kept her home open and available for visits by Rose A. and Alvin Sr., and also transported the children to visitation with their parents.[17]
(Testimony of Sara G., Eric B.) While the children's visits with their parents are usually brief, they look forward to being with their parents, and enjoy the visits. (Testimony of Sara G.)
Commencing in October of 1998, the respondent parents began a practice of sporadic and infrequent visitation. They had a few visits, both respondents called the children occasionally, but neither remembered Alvin's birthday on October 19, 1998 by sending a card, a gift, or calling him. On Christmas morning of that year, Sara G. picked up Rose A. at her residence and brought her back to visit with the children so she could watch the children open their gifts: Alvin Sr. was also invited to attend, but chose not to. Again, neither parent gave the children a gift or a card on this occasion. (Testimony of Sara G.)
When Rose A. was incarcerated from late December 1998 until May 1999, Sara G. brought the children to visit her on several occasions. Rose A. did not communicate with the children by mail during this period, but called them a few times. During this period, when he was physically CT Page 1787 separated from Rose A., Alvin Sr. visited the children twice. During the seven month period from the time of her discharge through the end of December 1999, Rose A. visited the children a total of nine times, including a visit on Christmas Day. Alvin Sr. saw the children seven times during this period. Although he failed to call Alvin on his birthday in November and sent no card, he did provide a gift for him later in the month. He did not visit on Christmas, and provided no cards or gifts for his children. (Testimony of Sara G.)
In the early part of 2000, visits continued to be sparse and sporadic. The respondent parents visited with their children during the course of Dr. Freedman's evaluations in February, and Rose A. assisted Debra with her hair on one occasion. On Debra's birthday in April of 2000, the respondent parents visited with the children, and Alvin Sr. brought a stuffed animal for his daughter. When Rose A. commenced her stay at Fresh Start in May, she was temporarily prohibited from seeing these children, although both she and Alvin Sr. called on two occasions during that month. No visits occurred during June or July of 2000, although Alvin Sr. was ostensibly alone and available to visit his children. In August of 2000, Fresh Start permitted Rose A. to recommence visitation. Thereafter, the children generally have seen their mother and father on Saturdays, although Alvin Sr. occasionally visits on Sundays. (Testimony of Sara G.) The respondent parents bring food and toys to these visits, and the children enjoy spending time with them. (Testimony of Karen V.)
1. DEBRA
Debra has a placid and easy-going personality which allows her to adapt to difficult situations without undue stress. When evaluated at age six by Dr. Freedman, Debra demonstrated roughly average levels of development and intelligence. She knows that Rose A. and Alvin Sr. are her biological parents, and takes genuine pleasure in being with them. (Testimony of Dr. Freedman.)
Upon initial placement with DCF, Debra demonstrated significant overtly sexualized behavior, inappropriate for her age. Although she attempted to engage her brother in like activity, Debra alternatively assumed a maternal role toward him, acting in a parentified manner far beyond her years. Debra is doing exceptionally well in her current placement with Sara G., and these behaviors have markedly improved during her foster care. (Testimony of Dr. Freedman, Lisa W-C.)
2. ALVIN
According to Dr. Freedman, Alvin has a low-average level of intelligence, with generally healthy emotional and physical development. CT Page 1788 Alvin is capable of reacting to new or unwelcome circumstances by misbehaving, even when this causes negative attention from the adults around him. Prior to his placement with DCF, he had caused problems in school due to his physical aggression toward others in his class, and had poor behavior observed at home, as well. Alvin's aggression was also obvious when he began to live with Sara G., but has moderated during his foster care. (Testimony of Dr. Freedman, Sara G.) Alvin also initially displayed sexualized behavior which was inappropriate for his age: again, this has abated during his stay with Sara G. (Testimony of Sara G.)
Alvin knows that Rose A. and Alvin Sr. are his biological parents, and seemed to enjoy being with his father. Alvin's behavior was better with his father than with his mother, which is consistent with a child of his age, rather than a manifestation that a greater alliance exists with one parent rather than the other. (Testimony of Dr. Freedman.) Generally, Alvin is doing well in his current foster placement: he still has periodic bouts of misbehavior, but is very responsive to intervention by his classroom teacher or Sara G. (Testimony of Lisa W-C.)
 II. ADJUDICATION
As to the adjudicatory phase of this hearing,[18] the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on November 29, 1998 through to January 13, 2000,[19] and has determined that statutory grounds for termination exist.
A. LOCATION AND REUNIFICATION
With respect to the statutory element of location and reunification, required for termination pursuant to General Statutes §17a-112(c)(1),[20] the court finds as follows, based on the clear and convincing evidence presented at trial:
DCF made reasonable efforts to reunify Debra and Alvin with their parents by means of the visitation opportunities continuously established, enabled and facilitated by the foster parent. Rose A. and Alvin Sr. seem to argue that DCF should have done something more, independent of the assistance provided by the foster mother, in an affirmative effort to reunify them with these children. They have not suggested what more could have been done, given the fact that the foster mother maintained an "open door" policy, through which the biological parents were welcome to visit so long as they were not under the influence of any substances, and further recognizing that Rose A. and Alvin Sr. lived but a few blocks from these children for the major part of the CT Page 1789 adjudicatory period. (Testimony of Sara G., Eric B.) Rose A.'s periods of incarceration or residential treatment, during which Sara G. provided more limited visitation, constitute self-imposed primary limitations on the reunification process. In re Shane P., 58 Conn. App. 234, 241
___ A.2d ___ (2000). The department would not have been mandated to utilize its resources to provide transportation or access to other visitation facilities, given the "open door" policy maintained by the foster parent. Similarly, there can be no obligation, on DCF's part, to force the respondent parents to visit with Debra or Alvin.[21]
Throughout the adjudicatory period, Rose A. and Alvin were given the opportunity to visit their children, and they failed to appropriately utilize that option. They tended, instead, to their own needs, so that visitation occurred only at a tragically intermittent pace. Even when the respondent parents were physically separated from each other, as the result of incarceration or inpatient substance abuse treatment, they failed to suitably utilize these opportunities to visit with their children. The pathological symbiosis between Rose A. and Alvin Sr., coupled with their manifest disinterest in Debra and Alvin, emerge as the main causes for the failure of reunification between these children and their biological parents. That disinterest was not caused by DCF, but was intrinsic to the personalities of Rose A. and Alvin Sr., unresolved despite the reasonable efforts made by the petitioner during the pre-adjudicatory, adjudicatory, and post-adjudicatory periods examined by the court.
B. STATUTORY GROUNDS FOR TERMINATION
With respect to the statutory grounds for termination of parental rights, the court finds the following to have been established by clear and convincing evidence:
1. ABANDONMENT — § 17a-112(c)(3)(A)
 a. ROSE A. AND ALVIN SR., THE RESPONDENT PARENTS
The petitioner claims that the statutory ground of abandonment exists in this case as to both the respondent mother and the respondent father, pursuant to Statutes § 17a-112(c)(3)(A).[22] The evidence in this case establishes that both Rose A. and Alvin Sr. have rarely called to inquire about the well-being or progress of these children or sent any cards, letters or gifts; have taken little advantage of the opportunities for visitation provided to them, as described in Part II. A., above; and have failed to pay any support for Debra or Alvin. Rose A. has but a minimal relationship with Debra, and no measurable relationship with Alvin, such that she has abandoned the children in the sense that she has CT Page 1790 failed to maintain a reasonable degree of interest, concern or responsibility as to their welfare. Alvin Sr. has no measurable relationship with either child, and he has abandoned the children in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to their welfare. Accordingly, the court finds this issue in favor of the petitioner as to both Rose A. and Alvin Sr.
The evidence received by the court, consistent with the opinion provided by Dr. Freedman, clearly establishes the foster mother was genuinely interested in facilitating reunification, based upon her own religious beliefs and personal convictions. She identified Rose A. and Alvin Sr. as her friends, notwithstanding their shortcomings. (Testimony of Dr. Freedman.) She kept her home open to them as a visitation resource, unless violence or drug use interfered. (Testimony of Dr. Freedman, Sara G.) The placement of Debra and Alvin with this foster mother represented the optimal circumstances available for promotion of reunification in this case.
However, notwithstanding these maximum opportunities for visitation and contact with their children manifest through this placement, during the fifteen month period prior to the interactional evaluation in mid-February 2000, the respondent parents visited Debra and Alvin on few occasions, as detailed through Part I.D. above and Parts II. B. 1. b. and c. below. (Testimony of Dr. Freedman, Sara G.) Such visitation as did occur was inconsistent and sporadic, and primarily at the encouragement of the foster parent." (Exhibit 14.) Based on this evidence, Rose A. and Alvin Sr. have clearly failed to meet the standard establishing that "[a] parent's interest in his child must not merely be sporadic in nature, but must exist on a consistent and continuing basis. See In re Migdalia M.,6 Conn. App. 194, 210, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986)." In re Shane P., 58 Conn. App. 244, 256, ___ A.2d ___ (2000). See also In re Deana E., 61 Conn. App. 185, 193, 194, ___ A.2d ___ (2000). The respondent parents' self-restricted visitation did not increase in frequency or duration until Rose A. secured the comfort and sponsorship of Fresh Start, her alternative to incarceration.
The tragedy of this dismal visitation pattern is emphasized by the close proximity of the foster home occupied by the children and the local residence of their parents. The lack of communication between the respondent parents and their children heralds a clarion message, resounding throughout the clear and convincing evidence received by this court: during the adjudicatory period, Rose A. and Alvin Sr. had abandoned Debra and Alvin, within the meaning of § 17a-112(c)(3)(A).
b. ROSE A., THE MOTHER
CT Page 1791
Rose A. has established a pattern of inattention to Debra and Alvin which belies her claim that she has not abandoned these children. During her incarceration from December 1998 through May 24, 1999, she failed to call, write to or otherwise communicate on a regular basis with either child. There was no evidence presented from which the court could reasonably conclude that she requested visitation with them, or even inquired about their well-being, or that she tolerated any contact other than the visits sponsored by Sara G. The court is mindful that "[t]he restrictions on movement that are inherent to incarceration . . . do not excuse a failure to make use of available, albeit limited, resources for communication with [these children]." (Citation omitted.) In re ShaneP., supra, 58 Conn. App. 256. Furthermore, even following her release from Corrections, Rose A. failed to consistently maintain contact with her children until the summer of 2000, when the visitations became an integral part of her treatment at Fresh Start. (Exhibit 14.)
Although Rose A. has recently improved the frequency of her contact with Debra and Alvin, the clear and convincing evidence produced at trial establishes that from February 1999, through the end of September 2000, a period commencing approximately three months following the neglect adjudications, Rose A. visited with her children only seventeen times in 20 months. Three of the seventeen visits took place in August of 2000; four of the visits took place in September of 2000. During the prior eighteen months, Rose A. visited with her children only ten times. She called these children only twenty-one times during this period, averaging approximately one phone contact per month. Clearly, her children were not a priority or even a modest focus of her attention during the adjudicatory period occurring from November 28, 1998 through January 13, 2000. (See Testimony of Lisa W-C.)
Rose A. has argued that according to standards set by In re John G.,56 Conn. App. 12, 740 A.2d 496 (1999) and In re Roshawn R.,51 Conn. App. 44, 720 A.2d 1112 (1998), she did not abandon her children as a matter of law. Neither case, however, supports her proposition that the petitioner in this matter has failed to establish abandonment in this matter, pursuant to § 17a-112(c)(3) A).[23]
Furthermore, the clear pattern of sporadic maternal visitation cannot support Rose A.'s implicit argument that she maintained a continuing, reasonable degree of concern about her children's health, welfare or emotional condition, as contemplated by either § 17a-112(c)(3)(A) or the case law upon which she has relied. See In re Deana F.,61 Conn. App. 185, 193, ___ A.2d ___ (2000). The evidence in this matter clearly establishes that unless Rose A. is herself participating in a residential drug treatment program, physically separated from the CT Page 1792 influence of her husband and deprived of access to cocaine and other drugs, she makes few if any efforts to contact her children, and any visits she conducts with them are very brief Such contact is insufficient to serve as a meaningful demonstration of interest in the children, as contemplated by § 17a-112(c)(3)(A). Rose's "efforts are best characterized as minimal" insofar as a continued degree of interest, concern or responsibility toward the welfare of Debra or Alvin is concerned. In re Deanna E., supra, 61 Conn. App. 194. Such minimal efforts, in the context of this case, constitute abandonment on the part of Rose A. as defined by the legislature through § 17a-112(c)(3)(A).
c. ALVIN SR., THE FATHER
From late December 1998 through May 1999, while Rose A. was incarcerated, Alvin Sr.'s contact with the children was inconsistent and unpredictable in nature. (Exhibit 14.) From May 24, 1999 through the end of trial, Alvin Sr. had visited with Debra and Alvin a total of sixteen times, although there were periods when he left the children without visiting them for many weeks at a time. These visits were frequently very short in duration, and occasionally over two hours in length. During the adjudicatory period, while Alvin Sr. was living nearby to Debra and Alvin, he called his children on only a few occasions. From January 2000 through the end of trial, Alvin Sr. called them only four times overall, and failed to utilize the telephone or other modes of communication, in an effective manner at any relevant time, in an effort to develop or sustain a relationship with these children. (Exhibit 14.)
Alvin Sr. has argued that the state cannot prevail on the issue of abandonment because he spent the majority of the adjudicatory period engaged in the rehabilitation process, which precluded his active visitation with the children. The court attributes little weight to this argument, which is contrary to the evidence presented. Historically, it is apparent that Alvin Sr.'s efforts at rehabilitation have been inconsistent. Until late July 1999, he had devoted very little time to the process of addressing his serious substance abuse issues. Under these factual circumstances, it would be disingenuous to conclude either that Alvin Sr.'s participation in drug treatment programs caused his statutory abandonment of his children, or that this treatment unreasonably constricted his visitation opportunities.[24]
Furthermore, as noted in Part II. B. 1. b., above, a pattern of sporadic visitation cannot support a parent's argument that he has maintained a continuing degree of interest in his children, within the meaning of § 17a-112(c)(3)(A). See In re Deana F., 61 Conn. App. 185,193, ___ A.2d ___ (2000). As with Rose A., the clear and convincing evidence of Alvin Sr.'s contact with his children during the adjudicatory CT Page 1793 period indicates that he placed little value on the court-ordered steps which obliged him to maximize association with Debra and Alvin. Either at law or by any objective analysis, Alvin Sr. did not maintain the degree of contact necessary to establish that he had maintained a reasonable degree of interest, concern or responsibility as to the welfare of either Debra or Alvin. In re Deana F., supra, 61 Conn. App. 193. He failed to offer or provide Debra or Alvin with financial support, letters, cards or gifts; failed to provide them with an appropriate residence; and failed otherwise to demonstrate meaningful responsibility for these children, within the meaning of § 17a-112(c)(3)(A).
Abandonment has here occurred, insofar as Alvin Sr. is concerned, notwithstanding both his clear ability to interact with his children in a manner that suits both Debra and Alvin, and notwithstanding the fact that he lived very near to them and had enhanced opportunities to supply them with visitation and other support. The court cannot speculate about whether or not Alvin Sr. intentionally avoided contact with his children during the adjudicatory period. The evidence permits the clear finding, however, that from December 1998 through January 13, 2000, Alvin Sr. attended to his personal priorities, without demonstrating his intention to parent these children and without focusing upon maintaining a relationship with them. Through clear and convincing evidence of these matters, the petitioner has established abandonment as a ground for termination of his parental rights, pursuant to § 17a-112(c)(3)(A).
2. PARENTAL FAILURE TO REHABILITATE — § 17a-112(c)(3)(B)
The petitioner claims that the statutory ground of parental failure to rehabilitate exists in this case, supporting the application for termination of both respondent's parental rights pursuant to General Statutes § 17a-112(c)(3)(B).[25] While both Rose A. and Alvin Sr. have very recently attended to some of the court-ordered expectations, the overwhelming evidence establishes that as of January 13, 2000, neither parent had accomplished personal rehabilitation, nor had either achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of their children, either parent could assume a responsible position in the lives of Debra or Alvin. Accordingly, the court finds this issue in favor of the petitioner.
a. ROSE A. AND ALVIN SR, THE RESPONDENT PARENTS.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . .[Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the CT Page 1794 particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . .[The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [supra, 250 Conn. 741]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In re ShylieshH., [56 Conn. App. 167, 180, 743 A.2d 165 (1999)." In re Sarah Ann K.,57 Conn. App. 441, 448, ___ A.2d ___ (2000). Thus, "[a]t the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she or he] had been at the time of the child's commitment." (Citation omitted; footnote omitted). In re Hector L., 53 Conn. App. 359,367, 730 A.2d 106 (1999).
In addressing the serious and chronic drug dependency affecting both respondent parents, the court has credited Dr. Freedman's reliable testimony concerning the implications and effects of both short and long-term substance abuse therapy, and establishing that their "future prospects for assuming a responsible parenting role for [their] children are bleak. See In re Juvenile Appeal (Anonymous), 177 Conn. 648, 667,420 A.2d 875 (1979) (in termination proceeding, `[p]sychological testimony from professionals is rightly accorded great weight')." In reEden F., supra, 250 Conn. 706. Even after Rose A. or Alvin Sr., undergoes detoxification, the ensuing process of rehabilitation will consume many, many months. The recovering party would have to remain outside of a structured environment such as a drug rehabilitation program, halfway house or jail, and demonstrate the ability to refrain from drug use for at least one full year before any meaningful prediction could be made concerning the ability to remain drug-free. Thus, Rose A.'s or Alvin Sr.'s ability to maintain sobriety while in a drug rehabilitation program is not a valid indicator of the ability to remain substance-free after discharge, nor of the ability to remain substance-free for a prolonged period of time. (Testimony of Dr. Freedman.)
The court further credits and adopts Dr. Freedman's opinion that based on their long history of co-dependence, Rose A. and Alvin Sr. are likely to resume living together once Rose A. is discharged from Fresh Start, and that the restoration of their relationship would likely recreate the conditions that caused each to abuse drugs in the past. These parents would have to demonstrate the ability to live peaceably together, without CT Page 1795 abusing drugs and without domestic violence, for a minimum of six months, before they would appear as potential candidates for the return of their children. Assuming that Rose A. is released from her treatment program in May of 2001, as planned, under this protocol, the earliest time they could have custody of the children would be October of 2001. (Testimony of Dr. Freedman.)
The statutory framework created by § 17a-112(c)(3)(B) requires the court not only to analyze the parent's rehabilitation as it relates to the needs of a particular child, but also to consider if such rehabilitation is foreseeable within a reasonable time. In re Hector L., supra, 53 Conn. App. 366-367. Because of this requirement that the court predict what may happen within a reasonable time after the filing of the petition for TPR, the court must consider not only Rose A.'s and Alvin Sr.'s conduct prior to the filing of those petitions, but also their conduct after that time. In this case, this was a period of some ten months, during which time both Rose A. and Alvin Sr. made some progress in their personal rehabilitation process. Thus, while the respondent parents may be demonstrating some success with their current rehabilitation programs, the court has balanced this against their history of lack of compliance with aftercare regimens, recurrent rehabilitation failures, and relapses.
Upon due consideration, the court has determined that there is an inadequate basis for allowing additional time for either respondent parent's rehabilitation to be accomplished. (See Testimony of Dr. Freedman.) In re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847
(2000), citing In re Christina V., 38 Conn. App. 214, 218-22, 660 A.2d 863
(1995). "It is axiomatic that the court can rely on factors occurring after the date of the filing of the petition to terminate parental rights when considering if additional time would promote rehabilitation." In reAmber B., 56 Conn. App. 776, 785, 746 A.2d 222 (2000). In this case, however, those factors constitute inadequate evidence upon which the court could reasonably base a decision that allowed additional time for parental rehabilitation, while their children continued to languish, as they have since October of 1998, in foster care. See In re Kasheema L.,56 Conn. App. 484, 489, 490, 744 A.2d 441 (2000).
b. ROSE A., THE MOTHER
The clear and convincing evidence in this case establishes that Rose A. suffers from chronic and persistent polysubstance dependence, with a predilection for using marijuana, forms of cocaine, or heroin. This substance dependence fundamentally interferes with her ability to perform the activities of daily parenting, and serves as a major impediment to reunification with Debra and Alvin. (Testimony of Dr. Freedman, Stephanie CT Page 1796 C.; Exhibit 10, 14.) Rose A.'s prognosis for realistic recovery from drug use is further impaired by Rose A.'s insistence on maintaining a relationship with Alvin Sr., although he, his lifestyle, and his abusive behavior, clearly represent triggers for her drug use. Even if Rose A. were drug-free for months, her recovery from drug use would not be assured: ongoing sobriety would require vigilance, consistent participation in after-care groups, and abstinence from such stimuli. Rose A. lacks the job skills, history of successful education, demonstrated ability to care for a family, or supportive healthy personal relationships which represent factors likely to enhance the success of individuals who historically abused drugs, but seek a substance-free lifestyle. Rose A. comes from a highly abusive and neglectful family, so she cannot seek reasonably succor from that potential support system. (Testimony of Dr. Freedman; see also Exhibit 14.)
The court credits and adopts Dr. Freedman's opinion that Rose A. has remained morbidly dependent on Alvin Sr., even though she knew him to be extremely dominant and controlling, liable to use physical abuse to get his own way, and subject to encouraging her to be involved in illegal activities to provide income for him. Such behavior on Rose A.'s part, during the adjudicatory period and unresolved thereafter until her nearly compelled participation in Fresh Start, indicates that this respondent still lacks the ability to make appropriate judgments about her own life, let alone the lives of children who would be dependent upon her, and that there is little likelihood that she will ever be able to provide a stable home or to fulfill a parental role for Debra and Alvin. (Testimony of Dr. Freedman.) Such a conclusion is clearly consistent with Rose A.'s persistent failure to comply with the specific steps for rehabilitation which have been provided to her through the court process.[26]
The court further credits and accept's Dr. Freedman's explanation that even if Rose A. is able to provide adequate parenting for her youngest child, the addition of two older children to the household would create stresses with which this mother cannot cope. The responsibilities and vicissitudes attendant to caring for three children including a very young child, instead of one, would create conditions ominously competent to vitiate any sobriety which Rose A. might otherwise be able to attain and maintain.[27] See In re Kasheema L., supra, 56 Conn. App. 489. (Testimony of Dr. Freedman.)
Multiple aspects of the evidence support the conclusion that Rose A. was not rehabilitated during the adjudicatory period, and that she is not likely to fulfill the criteria of § 17a-112(c)(3)(B) within a reasonable period into the future. As noted, Rose A. had persisted in using cocaine following her in-patient stay at the Mt. Sinai treatment CT Page 1797 program, even during the first trimester of her most recent pregnancy. (Testimony of Stephanie C.) This relapse indicates that although Rose A. may respond positively while in active treatment, her drug abuse is so chronic and pervasive in her life that, at the very least, she persisted in having very poor judgment about her obligations as a parent. Her history of relapse foreshadows the potential for recurrent relapsing behavior in the future, when Rose A. finds herself in conditions which do not provide absence from stress or tensions related to domestic relations or the need to provide herself with basic needs such as food and shelter, and which do not absolutely and rigorously shelter her from exposure to illegal substances. (Testimony of Dr. Freedman; Karen V.) SeeIn re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000) (failure to rehabilitate ground sustained where the respondent continued to use drugs after accepting treatment for substance abuse).
Rose A. argues that current participation in the Fresh Start Program, and the relatively successful record she had maintained with that agency, indicate that she has achieved sobriety and that she will remain drug-free and stable when she finishes the program in May of 2001. The court ascribes little weight to this aspect of Rose A.'s claim. First, the court notes that she has accomplished these goals only while living in a highly structured environment, free of exposure to the outside influences and temptations, such as Alvin Sr., that she will encounter when she leaves the program. Second, the court concludes that Rose A.'s motivation to succeed at Fresh Start is not derived from her effort to earn reunification with Debra and Alvin: she did not voluntarily enter the program, but remains there under her probation officer's threat of imminent return to incarceration if she fails to adhere to the probation protocol. Third, the court accepts and relies upon Dr. Freedman's admonition that a one year period of abstinence and steadfast attention to after care, following discharge from a drug treatment program, must be completed before any meaningful assessment of the actualization of rehabilitation can be made. This opinion is clearly consistent with Rose A.'s history of failure to maintain sobriety even after ostensibly successful drug treatment in the past.
Fourth, even at Fresh Start, Rose A. continues to encounter substantial difficulty in succeeding with recovery from substance abuse and domestic violence issues because she remains overly focused upon Alvin Sr. and the role he may continue to play in her life. (Testimony of Karen V.; Exhibit G.) This difficulty is consistent with Dr. Freedman's observation concerning Rose A.'s damaging dependence upon her husband. As a result of this continuing problem, Fresh Start has predicted that Rose A. will remain under their care and physical supervision through August of 2001, as she will not likely be ready for discharge by May of 2001, as planned. Furthermore, following discharge, as noted above, Rose A. will CT Page 1798 still be required to participate in a Fresh Start three-month aftercare program, in order to comply with the conditions of her probation. (Testimony of Karen V., Karen H.)
As noted above, the implications of § 17a-112(c)(3)(B) effectively require the court to consider whether Rose A.'s rehabilitation is foreseeable within a reasonable time. In re Hector L., supra,53 Conn. App. 366-367. A facilitated increase in child visitation and apparent freedom from substance abuse, under the circumstances of this case, where such freedom occurs only while Rose A. receives full supportive services seven days a week, twenty-four hours a day, does not demonstrate that she has achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time the respondent could assume a responsible position in the lives of her children, within the meaning of In re Michael L., supra,56 Conn. App. 694.[28] See also In re Kasheema L., supra,56 Conn. App. 489; In re Christina V., 38 Conn. App. 214, 218-22,660 A.2d 863 (1995).
Using the tests established through § 17a-112(c)(3)(B), it is apparent that neither Debra nor Alvin will benefit from waiting the requisite one year following Rose A.'s anticipated May 2001 discharge from the Fresh Start Program, in an effort to learn whether their biological mother has actually succeeded with her rehabilitation.[29]
Neither child would benefit, either, from waiting the six months after her discharge that is requisite to determining whether domestic violence or substance abuse will recur when Rose A. is living, again, with her husband Alvin S. In Dr. Freedman's words, given the problems Rose A. and Alvin Sr. have faced in the past, and given the ages of Debra and Alvin, "I don't think it makes sense for the children to wait." (Testimony of Dr. Freedman.)
Based on all the clear and convincing evidence provided at trial, the court concludes that Rose A. had not achieved rehabilitation as of January 13, 2000, and that she has not achieved a level of rehabilitation which would reasonably encourage a belief that at some future date she can assume a responsible position in the lives of these children. In reEden F., supra, 250 Conn. 706. Accordingly, the court finds this issue in favor of the petitioner.
c. ALVIN SR., THE FATHER
Alvin Sr. has adopted a chronically unstable lifestyle, placing his own desires and needs ahead of those with whom he has developed relationships over the years. He has developed liaisons with one female partner and then another, leading him to father a number of children who have been CT Page 1799 left in the care of their mothers, alone. He has participated in drug trafficking both for profit and to secure contraband for his own use. His history of lawful employment is almost nonexistent. Dr. Freedman's assessment, consistent with the evidence, establishes that Alvin Sr. is intrinsically unable to take responsibility for either his own problems, or for the problems he has caused for Rose A., Debra and Alvin. As Dr. Freedman credibly explained, Alvin Sr.'s ability to charm and entertain his children during a one hour interactional evaluation does not serve as a reliable indicator that he would be either able to sustain their interest over a longer period, or that he would maintain any interest in the children for a longer time commensurate with parental obligations. (Testimony of Dr. Freedman.)
As of the date of Dr. Freedman's evaluations, Alvin Sr. was still afflicted with his predisposition toward domestic violence and was in need of personal counseling to assist him in learning to provide for others, instead of having others provide for him. (Testimony of Dr. Freedman.) These problems were extant in February of 2000, despite the plethora of services referred to in Part I, above, and serve as indicia that Alvin Sr. had not become rehabilitated as of January 13, 2000, the adjudicatory date.[30]
Although Alvin Sr. finished his ADRC treatment in January of 2000, he failed to undergo regular and long-term urine testing through that agency for a number of months following that discharge.[31] At trial, Alvin Sr. submitted two reports of urinalysis ostensibly performed upon specimens collected on August 29 and September 5, 2000. (Father's Exhibits CC, DD.) The court concludes that these reports, without more, fail to establish, on a reliable basis, that Alvin Sr. has been rehabilitated from his known and long-standing addition to drugs. At the most, these reports establish that Alvin Sr. had not used drugs at a time near to the dates on which the urine specimens were submitted, long following the adjudicatory date. More importantly, the evidence presented at trial supports the clear inference that both Rose A. and Alvin Sr. were using illegal substances in March of 2000, when the family's DCF worker visited their home.
As noted, Alvin Sr. has lately become involved with the worthy Project T.E.A.C.H., sponsored by the CRT. Should Alvin remain with this program, which he commenced but sixty days before the commencement of trial, he would be eligible for two years of case management, substance abuse counseling, individual counseling, mental health assessments, job training, job referrals and housing. (Exhibit FF.) However, there was insufficient information or evidence presented from which the court could reasonably conclude that Alvin Sr. was likely to reap the benefits of this program so as to become rehabilitated within a reasonable time and CT Page 1800 thereby able to maintain a responsible role in the lives of Debra and Alvin, within the implications of § 17a-112(c)(3)(B). In re HectorL., supra, 53 Conn. App. 366-367. Participation in a multi-service program, such as Project T.E.A.C.H., for a very brief period which started eight months after the filing of the TPR. petition, and after a hiatus of similar length when no reliable evidence was available to establish compliance with court-ordered steps requiring abstinence from substance abuse, cannot reasonably support the conclusion that Alvin Sr. has achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time the respondent father could assume a responsible position in the lives of his children, within the meaning of In re Michael L., supra, 56 Conn. App. 694; see also In reChristina V., Conn. App. 214, 218-22, 660 A.2d 863 (1995).
In February 2000, Dr. Freedman concluded that Alvin Sr. showed little likelihood of ever being able to provide a stable home or to fulfill a parental role for Debra and Alvin based upon his observations of the interactions and his review of the respondent father's history of drug use and disconnected relationships with women. Even if he were able to remain drug-free, he would still revert to his pattern of relying upon his personal charm to allow him to depend upon others, without serving as a support for them. The court credits and accepts Dr. Freedman's cogent opinion that even if Alvin Sr. did successfully partake of therapy, given his history of substance abuse and domestic violence, given his lack of a stable residence, at least a year would have to transpire, without the resurgence of additional problems, before the respondent father could be found to have been rehabilitated. (Testimony of Dr. Freedman.) The transpiration of such a time period may benefit Alvin Sr., but cannot reasonably be found to be of benefit to his school-aged children.
Like Rose A., notwithstanding his availability and his gift for communicating with his children, Alvin Sr. failed to visit them on a regular basis during the adjudicatory period, and failed to express personal concern over their health, education and general well-being; he has shown no intention to be responsible for providing them with the necessary food, clothing, medical care and domicile necessary to their existence, and he has not furnished appropriate social or religious guidance for them. In re Deana F., supra, 61 Conn. App. 193. Taken together with the infrequent nature of his visitation, the court concludes that he, too, has failed, to meet the statutory requirements of "Section 17a-112(b)(1) [, which] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." Id.
Based on all the evidence provided to the court, it is clear that Alvin Sr. had not achieved the degree of rehabilitation, during the CT Page 1801 adjudicatory period, that would have made him an appropriate candidate for provision of paternal services to Debra or Alvin. Furthermore, the evidence clearly and convincingly demonstrates that Alvin Sr. has not achieved a level of rehabilitation which would reasonably encourage a belief that at some measurable future date he can assume a responsible position in the lives of these children. (Testimony of Dr. Freedman.) Inre Eden F., supra, 250 Conn. 706. Accordingly, the court finds this issue in favor of the petitioner.
 III. DISPOSITION
As to the dispositional phase of this hearing,[32] the court has considered the evidence and testimony related to circumstances and events up to and including October 17, 2000. the date upon which the evidence in this matter was concluded.
A. SEVEN STATUTORY FINDINGS[33]
The court has considered the evidence and information relevant to each of the following seven written factual findings in the course of determining whether to terminate the parental rights at issue in this case.[34]
 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(d)(1)
As to the timeliness, nature and extent of services made available to the parents and the children to facilitate reunification, the court finds by clear and convincing evidence that appropriate services were offered and maintained through DCF, including the generous opportunities for visitation allowed through the DCF foster mother's "open house" policy, as described in Part I.D. As described in Part I., services for Rose A. included reference to Blue Ridge, Hartford Behavioral Health, Interval House Wheeler Clinic, Hogar Crea, Connections, and the Salvation Army. Services for Alvin Sr., as also described in Part I., included reference to Hartford Behavioral Health, ADRC, Catholic Family Services, and Wheeler Clinic.
 2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112(d)(2)
Although the court has previously found that reunification efforts were no longer appropriate as to either respondent parent, this court further finds by clear and convincing evidence that DCF made reasonable efforts to reunify Rose A. and Alvin Sr. with their children, given the situation and circumstances as far as possible, given both parents' persisting problems in rehabilitation and in response to the abandonment described CT Page 1802 above.[35] DCF has offered and provided services as outlined in Finding 1, and as more specifically referenced through the testimony of the social workers and through the Social Study. (Exhibit 14, 15.) The court finds that the action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to secure permanent placement for children such as Debra and Alvin, who are in foster care.
3. COMPLIANCE WITH COURT ORDERS — § 17a-112(d)(3)
Reasonable and realistic steps for reunification were ordered for both respondent parents on October 21, 1998. The court finds by clear and convincing evidence that while both parents have complied with some of these expectations, they have failed to do so in a timely manner. Most importantly, during the fundamental adjudicatory period at issue, they failed to meaningfully comply with the expectations intrinsically related to improving their parenting skills, curbing their substance abuse, and visiting with their children. For the most part, the respondent parents were well able to visit with Debra and Alvin, given the fortuitous nature of their foster placement. Nonetheless, the respondent parents neither visited in a regular and consistent manner, nor took actions which could serve as proxies for visits, such as making phone calls, sending cards, letters, or gifts.
On balance, the respondent parents failed to adequately comply with this fundamental aspects of the court orders at issue. Rose A. failed to follow up with the Salvation Army programs offered for resolution of domestic violence issues, substance abuse, parenting and counseling; she failed to accept the rehabilitation services offered by Hogar Crea, Connections, Interval House, the YMCA or the other shelters to which DCF directed her; she continued to use drugs even in the face of "completion" of substance abuse treatment programs. Alvin failed to attend parenting education classes at Catholic Family Services; failed to comply with the evaluation and treatment regimens sponsored by Blue Ridge, Hartford Behavioral Health, or Wheeler Clinic; he persisted in violent behavior including abuse of Rose A., verbal assaults upon DCF workers. Both parties failed to avoid involvement with the criminal justice system during the pendency of the steps, further indicating their non-compliance with applicable court orders.
4. FEELINGS AND EMOTIONAL TIES OF THE CHILDREN — §17a-112(d)(4)
The evidence reveals that Debra and Alvin identify Rose A. and Alvin Sr. as their biological parents, and that they have bonded with them. There is no basis, however, from which the court could conclude that CT Page 1803 these children rely upon Rose A. or Alvin Sr. for any of the fundamental aspects of parenting, such as emotional or physical support, comfort or guidance, leadership or stability. Based on the clear and convincing evidence presented at trial, the court concludes that both children have developed strong emotional ties with their current foster mother, Sara G., who well fulfills these parental obligations, and whom the children love in return.
5. AGE OF THE CHILDREN — § 17a-112(d)(5)
As noted, Debra is eight and a half years old, and Alvin is just 6. The court finds, based on the clear and convincing evidence presented at trial, that these children require stability of placement and continuity of care in order to maximize their opportunity for healthy development during the remainder of their childhood. Both children require closure of the issues related to whether or not their biological mother or father will be able to assume a responsible position in their lives within in a reasonable period of time: the court has answered this question in the negative, given the ages and needs of these children. In re Hector L., supra, 53 Conn. App. 366-67.
 6. EFFORTS MADE BY THE PARENTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112(d)(5)
The evidence in this case clearly and convincingly indicates that except in very recent months, neither Rose A. nor Alvin Sr. has adjusted his or her circumstances, conduct or conditions to make it in the best interest of either child to return to either parent's home in the foreseeable future. They have failed to maintain due contact with Debra, Alvin, or Sara G., their foster mother, or DCF, and have made no significant contributions to the children's well-being. Neither respondent parent regularly sent either child written correspondence, holiday greeting, mementos or token gifts or made regular inquiries about these children by using DCF or the foster mother as a conduit. The court further finds that the failure of Rose A. and Alvin Sr. to make appropriate use of the individual and group substance abuse, domestic violence and/or parenting programs offered to them indicates that they have not made meaningful or sustained efforts to conform their conduct to even minimally acceptable standards, except during the most recent months when they were participating in the long-term treatment programs described above. While they have made progress in visiting Debra and Alvin, particularly in very recent months, the respondent parents's visits did not indicate that they were committed to establishing and maintaining a stable parent-children relationship. See In re Michael L., supra, 56 Conn. App. 688, 694, 745 A.2d 847 (2000). Additional time would not likely bring Rose A.'s and/or Alvin Jr.'s performance, as parents, CT Page 1804 within acceptable standards sufficient to make it in the best interests of the children for them to be reunited with their biological parents.[36]
 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILDREN — § 17a-112(d)(6)
As to the extent to which either parent has been prevented from maintaining a meaningful relationship with Debra and Alvin, the court finds by clear and convincing evidence that while their financial means were limited, no extrinsic factors existed which prevented regular, continuing contact with either the children or the foster parent. Although Rose A.'s periods of incarceration and residential treatment have acted as a partial impediment to maintaining a parent-children relationship, these periods of separation were caused and created by her own acts. Debra and Alvin have been maintained in foster care for no reason other than to keep them safe, well-cared for and attended to. Given the magnanimous position taken by Sara G., who has enhanced opportunities for visitation in this case, it is clear that, neither Rose A. nor Alvin Sr. can reasonably argue that DCF's efforts have in any meaningful way prevented them from maintaining a relationship with their children.
B. BEST INTERESTS OF THE CHILDREN — § 17a-112(c)(2)
The court is next called upon to determine whether termination of the parental rights of Rose A. and Alvin Sr. would be in the best interests of Debra and Alvin.[37] For the following reasons, the court finds this matter in favor of the petitioner.
Despite the consistent and appropriate efforts of DCF, and despite an adjudicatory period that was over a year in length, both Rose A. and Alvin Sr. have failed to meet the expectations established by the court as predicates to reunification. Of great concern is that both respondent parents appear to present a pattern of repeated but incomplete performance of the specific steps requiring abstinence from the use of illegal drugs, participation in counseling programs, lawful employment and even visitation. Their program work is most often performed not because of intrinsic interest in rehabilitation, but only when the most significant of consequences loom large on the horizon: Alvin Sr., for instance, became actively engaged in Project T.E.A.C.H. only when he faced the imminent prospect of the trial of this matter at the Child Protection Session. Rose A. complies with expectations requiring her to obtain substance abuse and domestic violence counseling, among other support services, only when she was presented with jail as the single alternative. Both respondent parents were, at the time of trial, able to CT Page 1805 meet the conditions of their continued participation in their respective long-term substance abuse programs: however, this compliance must reasonably be measured as being of brief duration, compared to the years and years of substance abuse and unstable environments that predated the involvement of the CRT or Fresh Start in their lives.
It is significant that even though the respondent parents had no obligations other than to themselves during the adjudicatory period,[38]
they failed to demonstrate any active interest in their children by visiting with them or inquiring about their well-being in other ways. Their ostensible care and interest in Debra and Alvin is of uncertain duration, given its renaissance which accompanied Rose A.'s recent, regimented Fresh Start lifestyle. Any current manifest concern about these children must be viewed, as well, in the light of the respondent parents' unresolved issues related to ominous chronic domestic violence issues, and their persistent inability to secure adequate and stable housing of their own which would serve as an appropriate residence for Debra and Alvin, and which these children so dearly deserve. (Exhibit 15.)
As the result of his evaluations, Dr. Freedman concluded that the children should not be permitted to leave their current foster placement, where they have found the sense of permanence and security that is requisite to a proper home for young children. Adoption by Sara G. would provide the best resource for these children, as it would indicate that they have a secure and stable environment where they will be welcomed and cared for until they reach majority. In the alternative, long-term foster care would provide Debra and Alvin with a beneficial sense of stability and security which is so fundamental to their healthy development. As Dr. Freedman stated with regard to resolution of the TPR, "The longer you wait . . . the more it's contrary to their best interests." (Testimony of Dr. Freedman.)
Counsel for Debra and Alvin concurs that the TPR should be granted in this matter, arguing that neither respondent parent has achieved such a state of rehabilitation as will allow them, now or within a reasonable period of time, to serve as responsible parents for these children. Despite the issuance of specific steps in June and October of 1998, and notwithstanding the passage of time, both parents are still in the initial stages of demonstrating their freedom from substance abuse and the future is still marred by spectre of domestic violence which is related to Alvin Sr.'s explosive personality disorder.
The court accepts the argument presented by counsel for Debra and Alvin, indicating that their biological mother and father are motivated to act as parents only when they are compelled to do so by external CT Page 1806 forces, such as the imminence of trial or reincarceration. In the words of this counsel, while the respondent parents may now show some signs of recovery from their substance abuse, this recovery "is incomplete, too late, and too fragile" to form the basis for denying the termination petition.
Although both children clearly have affection for the respondents and enjoy being with them, this affection does not rise to a level which would overcome the clear benefits of terminating the parental rights in this case. Although both children told Dr. Freedman that they wished to live with their biological parents, Alvin appeared to be angry at his mother during the interactional evaluation, and resisted being in her presence. The fact that a bond may exist between these children and their biological parents does not establish, for the purposes of a case such as this, the existence of a parent-child relationship that should be preserved, given Debra's and Alvin's need for permanency and stability. See In re Quanitra M., supra, 60 Conn. App. 105, 107.
While the court recognizes that legal separation of Debra and Alvin from Rose A. and Alvin S. could have a negative effect upon these children, as Dr. Freedman has opined, termination of parental rights would provide valuable benefits for Debra and Alvin, by way of allowing them to continue to thrive as they have under the excellent continuing care provided by their current foster mother.[39] The court finds this opinion to have great weight under the circumstances of this case, where the parents have long and consistently virtually ignored the existence of Debra and Alvin, electing instead to concentrate on their substance abuse-directed lifestyles for a prolonged period of time, and to the detriment of these children.
These children are fortunate, indeed, that a loving and permanent adoptive home with Sara G. is available for them. Sara G. is clearly devoted to these children, who through adoption would be provided with a permanent and nurturing home. With adoption, Debra and Alvin will be spared the need to fear whether their biological parents will ever be there to care for them: they will have the significant advantage of growing up in a family where the adult caretaker is not only committed to ensuring their health, safety and happiness, but where the adult caretaker is actually able to fulfill this commitment.
 IV. ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the children's best interests to CT Page 1807 terminate the parental rights of Rose A. and Alvin Sr., accordingly ORDERS:
That the parental rights of Rose A. and Alvin Sr. are hereby terminated as to Debra and Alvin.
That the Commissioner of the Department of Child and Families is hereby appointed the statutory parent for Debra and Alvin, for the purpose of securing an adoptive family or other permanent placement for these children.
That within thirty days of this judgment a written report addressing such permanency plan shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.